# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

CHRISTINE BOURNE,
    *Plaintiff*,

    v.

CITY OF MIDDLETOWN, *et al.*,
    *Defendants*.

No. 3:11-cv-00309 (JAM)

## RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Christine Bourne used to work as a payroll supervisor as an employee of the City of Middletown at the Middletown Board of Education. At the same time, she also held an elective office as treasurer for the City of Middletown. While employed at the Board of Education, she raised a number of concerns to the City's mayor about possibly fraudulent financial practices at the Board of Education. After speaking with the mayor and then giving a statement to the police, plaintiff alleges that she was subject to retaliation at her workplace at the Board of Education, culminating within several months in her suspension and transfer to another city position that plaintiff believes was a demotion.

Plaintiff has now filed this federal lawsuit against four defendants: the City of Middletown ("the City"); the Middletown Board of Education ("the Board"); Michael Frechette, who was the superintendent of the Board of Education while plaintiff worked there; and Nancy Haynes, who was plaintiff's supervisor at the Board of Education. Plaintiff principally alleges that she was subject to "whistleblowing" retaliation on the basis of her exercise of free speech to expose the financial irregularities at the Board of Education, and that she was suspended and transferred without being afforded her right to due process. The parties have all filed cross-motions for summary judgment.

For the reasons set forth below, I will grant and deny these motions in whole and in part as follows:

- ***Free Speech Retaliation (Counts One and Two).*** As to plaintiff's First Amendment claims, I DENY the motions for summary judgment with respect to the City, the Board, and plaintiff. I conclude there are several genuine issues of fact as to whether defendants impermissibly retaliated against plaintiff for protected speech. I GRANT defendants Frechette and Haynes's motion for summary judgment. I conclude that they are entitled to qualified immunity on plaintiff's federal cause of action, because it was not clearly established that their actions violated plaintiff's constitutional rights. I also conclude that Frechette and Haynes are not individually liable as plaintiff's "employer" under plaintiff's state law cause of action, Conn. Gen. Stat. § 31-51q.

- ***Battery (Count Three).*** As to plaintiff's battery claim, I DENY Haynes' motion for summary judgment. I conclude that plaintiff has adduced sufficient evidence for a reasonable jury to conclude that Haynes committed an intentional battery against her.

- ***Whistleblower Protection (Count Four).*** As to plaintiff's whistleblower protection claim under state law, I DENY all parties' motions for summary judgment (subject to the understanding that this claim is properly alleged against the City and the Board only). As with plaintiff's First Amendment claims, I conclude that there are several genuine issues of material fact as to whether plaintiff was disciplined in connection to protected speech.

- ***Procedural Due Process (Count Five).*** As to plaintiff's due process claim, I GRANT defendants' motions for summary judgment and DENY plaintiff's motion with respect to plaintiff's pre-transfer suspensions. I conclude that plaintiff was not deprived of a property right when she was suspended with pay. With respect to plaintiff's post-suspension transfer, I

DENY the motions for summary judgment by plaintiff and the City, and GRANT the motion

by the Board and Frechette. I conclude that genuine issues of fact remain with respect to

plaintiff's claim that her transfer amounted to a demotion and with respect to the amount of

process she was due. But I also conclude that only the City may be liable for any violation of

plaintiff's due process rights that did occur, because the City, and not the Board, had final

authority in the matter.

## BACKGROUND

Plaintiff was employed by the City beginning in 1994.[1] In October 2008, plaintiff began

working for the Board as a payroll supervisor. Beginning in 2009, she began reporting to

defendant Haynes, the Board's business manager. Doc. #96-13. Defendant Frechette, meanwhile,

was the Board's superintendent. Doc. #96-8. During that time, plaintiff was also the elected

treasurer for the City, which was a part-time elected position separate from her position with the

Board. Doc. #97-38 at 3–8.

In late 2009 or early 2010, plaintiff became concerned with a number of issues related to

the Board's finances. *See* Doc. #97-38. One of her concerns was that the Board was issuing

purchase orders that had no vendor identified, but instead listed "99999" in the place of a

vendor's name. This made it difficult to keep track of the order's intended recipient. *Id.* at 21.

Another concern was that the Board was reimbursing certain employees for mileage expenses in

what plaintiff thought to be excessive amounts. *Id.* at 13–14. Still another concern was that the

Board was carrying money over from one fiscal year to the next, rather than returning it to the

City as plaintiff believed was required. *Id.* at 23.

---

[1] Except where otherwise noted, the facts in this section are drawn primarily from those agreed upon by the parties in their statements submitted pursuant to Local Rule 56(a)(1). *See* Docs. #92-2, #95, #97-2, #100-1, #102.

Plaintiff communicated some of these concerns to Haynes between fall 2009 and May 2010.[2] *Id.* at 11–23. Plaintiff also discussed the issue of mileage reimbursements and "99999" orders with the City's mayor, Sebastian Giuliano, a number of times before May 2010. Doc. #92-23 at 13–14. Giuliano learned of the Board's use of the 99999 orders from plaintiff and from Tracy Vess, a clerk in the Board's business office. Doc. #97-43 at 7–14.

On May 14, 2010, there was a large public gathering in Middletown called the San Sebastian Feast, which Giuliano and plaintiff attended. At the feast, Giuliano asked plaintiff about the Board's accounting practices. Doc. #92-4 at 3–4. Plaintiff said that she thought the Board was holding money that belonged to the City, and she was concerned that the Board's accounting practices were inappropriate. Doc. #92-3 at 61–65. She asked Giuliano to speak with the City's finance director about the Board's practices. Doc. #92-4 at 6–7.

While at the feast, Giuliano also received a report from Debra Milardo, the City's personnel director, about a conversation between Haynes and another Board employee regarding a plan to go into the Board's offices the next day (a Saturday) and alter documents. Doc. #92-23 at 5–6. The following morning, Milardo contacted plaintiff and asked her to give a statement to the Middletown Police Department regarding her concerns. Doc. #92-4 at 9. Plaintiff met with the police, and said in a written statement that she was concerned that the Board's staff were planning to destroy or alter records in the accounts payable department. According to plaintiff's statement, clerical staff had recently become aware of possible accounting discrepancies. Doc. #97-32 at 2.

That day, the police began an investigation into the Board's possible misuse of funds. Police met with Frechette and gave him a notice signed by Giuliano that directed him to preserve

---

[2] The parties disagree regarding the contents of plaintiff's communication with defendant Haynes. *See, e.g.*, Doc. #100-1 at 4 (¶ 36); Doc #92-2 at 3 (¶ 14); Doc. #102 at 7 (¶ 36); Doc. #96-13 at 50–84.

all of the Board's records. Doc. #97-29 at 2; Doc. #97-30 at 2. The City also sent two officers to the Board's business offices. Doc. #97-34 at 2.

Plaintiff alleges that these events precipitated a campaign of retaliation by the Board against her for her communication with Giuliano and the police. According to plaintiff, over the ensuing days and weeks she was deprived of flexibility in her work schedule, was deprived of information that was necessary to do her job, ceased to be included in office functions, was deprived of overtime, and her office was vandalized. Doc. #97-38 at 31–34; Doc. #97-39 at 34–37. Near the end of her tenure with the Board, plaintiff was suspended with pay for approximately two days, Doc. #97-8 at 2, and told that the Board's payroll office had been "compromised" and "had to be investigated." Doc. #96-13 at 176. Plaintiff also testified that when she returned from suspension, Haynes confronted and physically assaulted her, grabbing her arm and scratching her as she attempted to leave the office. Doc. #97-39 at 40.

In the meantime, the Board had sued the City, contending that the City's actions taken while investigating the Board went beyond the City's authority and interfered with the Board's operations. Doc. #96-26 at 3–4. Eventually, as part of the settlement in that suit, the City agreed to transfer plaintiff from her position with the Board to a budget analyst position in the City's Parks and Recreation Department. Doc. #97-57; Doc. # 97-23; Doc. #92-4 at 36. The settlement provided that plaintiff would not subsequently be appointed to any position within the Board unless the Board's superintendent requested it. Doc. #97-57 at 7. Plaintiff was not given a choice in the transfer. Doc. #97-49 at 43.

Plaintiff filed a union grievance to protest her transfer from the Board of Education to the Parks and Recreation Department. Following a hearing, an arbitrator ruled in plaintiff's favor, concluding that there was no "just cause" for her transfer:

> In the final analysis, then, the finding is compelling that Ms. Bourne, who was doing a
> good job in her role as Payroll Supervisor, was removed from her position involuntarily
> and demoted. Why? Because employees including the Superintendent at the Board of
> Education resented the fact that she was selected by the Mayor to fill the position in the
> first place; then later on they wanted her ousted because she played a role in uncovering
> their unorthodox business practices.

Doc. #132-2 at 14.

Plaintiff brought this suit against the City, the Board, Frechette, and Haynes. Counts One
and Two of her amended complaint allege causes of action pursuant to Conn. Gen. Stat. § 51-31q
and 42 U.S.C. § 1983, contending that defendants unlawfully retaliated against plaintiff because
of her exercise of constitutional rights to free speech. Count Three alleges a state law claim of
battery against defendant Haynes. Count Four alleges a state law claim pursuant to Conn. Gen.
Stat. § 51-31m of unlawful retaliation against plaintiff for engaging in protected
"whistleblowing" activity. Lastly, Count Five alleges a cause of action pursuant to 42 U.S.C.
§ 1983 for a violation of plaintiff's constitutional right to due process in connection with her
suspensions and transfer to a new employment position.

Defendants have moved for summary judgment on all counts. Plaintiff has cross-moved
for summary judgment on all counts other than the battery claim. Docs. #92-97.

## DISCUSSION

The principles governing a motion for summary judgment are well established. Summary
judgment may be granted only if "the movant shows that there is no genuine dispute as to any
material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a);
*see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*). "A genuine dispute of
material fact exists for summary judgment purposes where the evidence, viewed in the light most
favorable to the nonmoving party, is such that a reasonable jury could decide in that party's
favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The evidence

adduced at the summary judgment stage must be viewed in the light most favorable to the non-moving party and with all ambiguities and reasonable inferences drawn against the moving party. *See, e.g.*, *Tolan*, 134 S. Ct. at 1866; *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). All in all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

### Counts One and Two – Free Speech Retaliation

Counts One and Two of the complaint allege that defendants retaliated against plaintiff because of her constitutionally protected speech activities.[3] Both the U.S. Constitution and the Connecticut Constitution protect the rights of government employees under certain circumstances to engage in free speech and not to be subject to retaliation by their government employer because of their exercise of protected speech. *See Garcetti v. Ceballos*, 547 U.S. 410, 417–20 (2006) (First Amendment); *Trusz v. UBS Realty Investors, LLC*, 319 Conn. 175, 191–211 (2015) (Connecticut Constitution, art. 1st, §§ 4 & 5).

In order to prove a claim of retaliation for engaging in constitutionally protected speech, a government employee must show: (1) that she has engaged in speech of the type that is subject to protection in the government employment context; (2) that her government employer took adverse action against her; and (3) that there was a causal connection between the protected speech or association and the adverse action. *See Matthews v. City of New York*, 779 F.3d 167,

---

[3] Count One alleges a constitutional cause of action that is created under state law, *see* Conn. Gen. Stat. § 31-51q, and Count Two alleges a constitutional cause of action that is created under federal law, *see* 42 U.S.C. § 1983. Because the state law cause of action that is alleged in Count One applies by the statute's terms only to an "employer," I understand Count One to be properly alleged only against the City and the Board as alleged dual "employers" of plaintiff, rather than against defendants Frechette and Haynes. *See Nyenhuis v. Metro. Dist. Comm'n*, 604 F. Supp. 2d 377, 384–85 (D. Conn. 2009); *Blue v. Carbonaro*, 2015 WL 3555294, at *18 (Conn. Super. 2015). Despite plaintiff's argument that Frechette and Haynes may have been personally involved with the actions of the employer (Doc. #97-1 at 30 n.4), plaintiff relies on cases involving 42 U.S.C. § 1983 and does not cite authority interpreting the scope of the term "employer" as used in § 31-51q.

172 (2d Cir. 2015) (describing elements of First Amendment retaliation claim by public employee).

Plaintiff argues that she engaged in protected speech when she spoke with Giuliano about her concerns that the Board was mishandling its finances and when she soon thereafter gave a statement to the Middletown police department. She asserts that defendants impermissibly retaliated against her because of this speech. Doc. #97-1 at 20-28. The parties dispute each element of plaintiff's claim—whether she was engaged in protected speech, whether she suffered an adverse action, and whether there was a causal connection between her protected speech and any adverse action. I will therefore consider each of these three elements in turn.

### 1.   Protected Speech

To determine whether a public employee's speech is protected from retaliation for purposes of a First Amendment retaliation claim, courts engage in a two-step inquiry. *See Matthews*, 779 F.3d at 172. First, a court must determine as a threshold matter "whether the employee spoke as a citizen on a matter of public concern." *Ibid.* This "public concern" determination itself "encompasses two separate sub-questions: (1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke 'as a citizen' rather than solely as an employee." *Ibid.* (internal quotation marks omitted). Even when an employee speaks about a subject matter of public concern, if the employee has done so pursuant to her official duties rather than in her capacity as a concerned citizen, then her speech is not subject to protection under the First Amendment, and she is thus not protected from adverse action by the employer. *See Garcetti v. Ceballos, supra*; *Ricciuti v. Gyzenis*, 834 F.3d 162, 168 (2d Cir. 2016).

Assuming that the employee's speech is made as a citizen about a matter of public concern, then the second step considers whether the employer has adequate reasons to restrict the employee's speech. This second step is often referred to as a *Pickering* balancing analysis. *See Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty.*, 391 U.S. 563, 568 (1968); *Matthews*, 779 F.3d at 172–73. The *Pickering* analysis asks "whether the relevant government entity 'had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer.'" *Matthews*, 779 F.3d at 172 (quoting *Lane v. Franks*, 134 S. Ct. 2369, 2380 (2014)); *see also Anemone v. Metropolitan Transp. Auth.*, 629 F.3d 97, 114–15 (2d Cir. 2011) (describing First Amendment speech rights of public employees).

The analytic framework I have just described is somewhat different for purposes of a claim arising under the Connecticut Constitution (as alleged in Count One) if the claim arises from speech that was made by an employee pursuant to her official duties (as distinct from speech made by an employee as a concerned citizen). Rejecting the U.S. Supreme Court's decision in *Garcetti v. Ceballos*, *supra*, the Connecticut Supreme Court has made clear that an employee does not categorically lose her right to be free from retaliation for any speech that she makes pursuant to her official duties; instead, if such speech was made pursuant to her official duties, it may still be protected from retaliation if the employee spoke out about highly significant matters of public concern such as official dishonesty, deliberately unconstitutional action, other serious wrongdoing, or threats to health and safety. *See Trusz*, 319 Conn. at 210–11, 216–17.

### A.  *Whether plaintiff's speech was on a matter of public concern*

A matter of public concern is one that "relates to any matter of political, social, or other concern to the community." *Singer v. Ferro*, 711 F.3d 334, 339 (2d Cir. 2013). To evaluate whether speech is addressed to a matter of public concern, courts look to "the content, form, and context of a given statement," and consider, among other things, "whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." *Ibid.*

Viewing the facts in the light most favorable to plaintiff, I conclude that plaintiff's speech here was on a matter of public concern. In her conversation with Giuliano at the Saint Sebastian feast, plaintiff raised concerns about the Board's violation of accounting ethics and misuse of public funds. Doc. #97-38 at 30. Likewise, she also gave a statement to the police department. Whether the Board, a public entity, overpaid its employees and used accounting tricks to hold on to unspent public dollars is of general concern to the community. Plaintiff's speech concerned the potential misuse of a significant amount of funds, including, for instance, alleged misrepresentations regarding $20,000 in federal grant money. Doc. #97-31 at 3. Such practices were more than "minor payroll discrepancies" and clearly "implicate[d] the proper stewardship of the public fisc." *Singer*, 711 F.3d at 340; *see also Ricciuti*, 834 F.3d at 169 (police officer's complaints about padding of overtime practices was of public concern). In addition, plaintiff told the police that she feared the Board intended to destroy documents.

Defendants' arguments to the contrary are not convincing. The Board argues that plaintiff has not sufficiently proved that her motivation was to publicize suspected wrongdoing, Doc. #101 at 11. Likewise, the City asserts that "it is clear that Bourne was complaining about the 'office climate' which is an internal working concern[]." Doc. #92-1 at 5. But the subject matter of plaintiff's speech—potentially improper and fraudulent accounting practices—goes beyond a

10

simple gripe about the workplace environment. And even if plaintiff were not entirely, or even mostly, motivated by a desire to publicize wrongdoing, the Second Circuit has held that "a speaker's motive is not dispositive in determining whether his or her speech addresses a matter of public concern." *Sousa v. Roque*, 578 F.3d 164, 173–74 (2d Cir. 2009). *Sousa* makes clear that a person who is "motivated by a personal grievance" can still "be speaking on a matter of public concern." *Ibid.* (emphasis omitted). The potential misuse of large sums of money by public agencies (as well as the potential destruction of documents) is self-evidently a matter of public concern, and defendants have not shown otherwise. *See, e.g.*, *Ricciuti*, 834 F.3d at 168–70 (affirming denial of qualified immunity for plaintiff police officer's speech protesting police department overtime pay practices).

### B.   *Whether plaintiff was speaking as a citizen or pursuant to official duties*

Because plaintiff's speech dealt with a matter of public concern, I must next determine whether plaintiff spoke "as a citizen" or "solely as an employee." *Matthews*, 779 F.3d at 172. Courts address the "citizen/employee distinction" by asking "(A) did the speech fall outside of the employee's official responsibilities, and (B) does a civilian analogue exist?" *Id.* at 173. The question is one for which an answer "is not susceptible to a brightline rule," but instead depends on "the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two." *Ibid.*

At the outset, I will consider whether plaintiff's speech was within the scope of her job responsibilities as a payroll supervisor, as distinct from any additional public responsibilities that she had as the City's elected treasurer. Plaintiff's job responsibilities as payroll supervisor generally involved overseeing and facilitating the entering and maintenance of payroll information and associated records. Doc. #97-63 at 2. Plaintiff's speech regarded a range of

accounting practices that she was concerned about: the 99999 vendor designation, the mileage pre-approvals, the misuse of grant funds, and the holding over of funds from one fiscal year to the next. Doc. #92-20 at 11–22.

There is doubtlessly a general connection between plaintiff's payroll job and these concerns. Plaintiff's concerns relate to accounting practices, and plaintiff's job in payroll was part of the Board's accounting apparatus, broadly speaking. But of these concerns, only the question of mileage pre-approvals—which dealt with money that was arguably part of individual employees' compensation—is directly related to payroll. Nothing in plaintiff's job description indicates that it was ordinarily within the scope of plaintiff's duties to evaluate financial concerns outside of the payroll area.

Defendants misplace their reliance on the Second Circuit's decision in *Looney v. Black*, 702 F.3d 701 (2d Cir. 2012), in which a majority of the Second Circuit panel determined that certain complaints made by a town employee were made pursuant to his official duties in light of the fact that plaintiff's speech "owed its existence to [the plaintiff's] job duties *and was made in furtherance of those duties.*" *Id.* at 718 (quoting *Ross v. Breslin*, 693 F.3d 300, 308 (2d Cir. 2012)).  Here, by contrast, it is far from clear that plaintiff's complaints necessarily owe their existence to her job responsibilities as a payroll supervisor, much less that they furthered her job duties. In any event, even if I were to conclude that plaintiff's speech owed its existence to her job duties, the Supreme Court has more recently ruled that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech," because "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an

employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 134 S. Ct. at 2379.

Defendants note that the City's personnel rules require city employees to "report[] to proper City authorities unethical or illegal conduct by fellow employees." Doc. #96-5 at 28. They argue that plaintiff's reports should be understood as action taken pursuant to her professional duties under these rules. Doc. #94 at 32-33.

I am not persuaded. The requirement defendants point to *could* potentially support the interpretation of plaintiff's conduct as occurring "within the scope of" her duties as an employee. *Lane*, 134 S. Ct. at 2379. But it does not appear that reporting suspected misconduct was "*ordinarily*" within the scope of plaintiff's duties. *Ibid.* (emphasis added). Unlike in *Ross v. Breslin*, *supra*, a case defendants point to in which a payroll clerk's reports of payment irregularities were held to be unprotected, there is no evidence that plaintiff "frequently" raised irregularities or understood such reporting to be a regular part of her job obligations. *See also Matthews*, 779 F.3d at 173–74 (distinguishing *Ross* on same grounds and finding that police officer's "policy-oriented speech" objecting to use of arrest quotas was protected because registering such objections "was neither part of his job description nor part of the practical reality of his everyday work" and despite obligation as part of police officer's job responsibilities to report misconduct of other officers).

"Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Garcetti*, 547 U.S. at 424–25. In other words, the existence of a boilerplate reporting requirement in an employment contract does

13

not turn all of a public employee's allegations of wrongdoing into obligatory, and therefore unprotected, speech.

The conclusion that plaintiff was speaking as a private citizen is bolstered by the "civilian analogues" inquiry. *See Matthews*, 779 F.3d at 173. This inquiry asks whether the speech at issue was made "through channels available to citizens generally," or through channels available to public employees only, such as an employee grievance process or an internal office memorandum. *Jackler v. Byrne*, 658 F.3d 225, 237–38 (2d Cir. 2011).

Plaintiff reports speaking to Giuliano on several occasions. Doc. #92-20 at 9. The record does not reflect the exact form or context of each of these communications. It is possible that plaintiff had more access to Giuliano by virtue of her status as a public employee, but there is no indication that her communications with Giuliano were through such formalized mechanisms as a grievance or internal memorandum. To the contrary, the single incident most discussed by the parties is plaintiff's conversation with Giuliano at the Saint Sebastian festival, a church gathering. Doc. #92-20 at 19–20. Speaking with the mayor at a community event is "a path available to ordinary citizens." *Matthews*, 779 F.3d at 176; *see also Ricciuti*, 834 F.3d at 169 (noting that "plaintiff communicated her concerns to members of the public and contacted local leaders to push for reform, just as a private citizen exercising her First Amendment rights would do").

Defendants also argue that the Court should consider whether plaintiff was speaking in her role as the City's treasurer, an elected part-time position that she also held while these events transpired. Indeed, the Second Circuit has concluded that an elected policymaker may have less First Amendment protection against retaliation from other government officials than does an ordinary public employee. *See Camacho v. Brandon*, 317 F.3d 153, 160–64 (2d Cir. 2003)

14

(elected city councilman did not have First Amendment protection against retaliation by other city council members involving the firing of the council member's aide); *but see Velez v. Levy*, 401 F.3d 75, 95–99 (2d Cir. 2005) (elected school board member had First Amendment right against removal from school board by chair of board).

These decisions involving an elected policymaking official are distinguishable because they did not involve an official who had dual roles—both as an elected official and as a paid civil service employee. In view that the complained-of retaliation at issue in this case was taken solely with respect to plaintiff's civil service employment as a payroll supervisor, I am not persuaded that any right to take adverse action against plaintiff in her separate capacity as payroll supervisor should be determined by reference to any diminished rights against First Amendment retaliation that she may have had in her capacity as the City's elected treasurer.

A contrary conclusion would not be consistent with the *Pickering* line of cases, in which the question of whether a person spoke as a public employee or as a citizen has always been asked in reference to the job in which the retaliation allegedly occurred (rather than in reference to some other public position simultaneously held by a plaintiff). I therefore decline to conclude that if plaintiff's speech were undertaken in her capacity as city treasurer, then this would be a valid justification for defendants' adverse action against her in her civil service position of payroll supervisor. Viewing the facts in the light most favorable to plaintiff at this time, plaintiff spoke as a citizen on a matter of public concern.[4]

---

[4] Notwithstanding my conclusion that plaintiff's dual roles should not have diminished her right to be free from free-speech retaliation, her dual roles raise a significant issue with respect to the claims of the individual defendants to qualified immunity (as I will discuss below).

C.  *Pickering* Analysis

Next, the Court must consider the *Pickering* analysis test and ask whether the potential disruption to the government's activities caused by plaintiff's speech justifies the government's treatment of her. The analysis permits a government employer to "take an adverse employment action against a public employee for speech on matters of public concern if: (1) the employer's prediction of the disruption that such speech will cause is reasonable; (2) the potential for disruption outweighs the value of the speech; and (3) the employer took the adverse employment action not in retaliation for the employee's speech, but because of the potential for disruption." *See Anemone*, 629 F.3d at 115. The burden of demonstrating these elements is on the defendants, *ibid.*, and the balancing test can justify "**only** *those speech restrictions that are necessary for their employers to operate efficiently and effectively*." *Jackler v. Byrne*, 658 F.3d 225, 235 (2d Cir. 2011) (emphasis in original).

Defendants have not met their burden to show that no genuine issue of fact remains as to the reasonableness of the actions that were taken. To begin with, plaintiff's speech—which regarded her concerns about the potential misuse of public funds—was of high public value. "Exposure of official misconduct . . . is generally of great consequence to the public." *Id.* at 236. And while plaintiff's speech had potential for disruption, the disruption was primarily due to the City's investigation of the Board's alleged misconduct. Courts have been hesitant to weigh seriously the disruption government entities may face because of the exposure of their illicit conduct. *See id.* at 242; *Frank v. Relin*, 1 F.3d 1317, 1331 (2d Cir. 1993). I see no need to weigh such disruption particularly heavily here. On balance, then, the value of plaintiff's speech outweighs the costs attributable to it. And, in any event, defendants have not shown that their actions against plaintiff were the minimum "necessary . . . to operate efficiently and effectively."

16

*Jackler*, 658 F.3d at 235. Viewing the facts in the light most favorable to plaintiff, I therefore conclude that plaintiff's speech was protected under the First Amendment from retaliation by her employer.

### 2. Adverse Action

Next, defendants argue that plaintiff suffered no adverse action. Doc. #101 at 14. Adverse action in the First Amendment retaliation context is defined as action "that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Wrobel v. County of Erie*, 692 F.3d 22, 31 (2d Cir. 2012).

Plaintiff alleges that defendants took a series of adverse actions against her in a "campaign of retaliation" after she engaged in the speech described above. Doc. #97-1 at 23–24. Plaintiff has submitted evidence that she was deprived of previous flexibility in her work schedule, was deprived of information necessary to do her job, was not included in office functions, was deprived of previous opportunities for overtime, was suspended, was physically assaulted, had her emails monitored by her supervisor, and had her office vandalized. Doc. #97-38 at 31–34; Doc. #97-45 at 8; Doc. #97-8. And as part of the resolution of an ongoing dispute between the City and the Board, plaintiff was transferred from her position with the Board to a budget analyst position in the City's parks and recreation department. Doc. #97-49 at 34–36.

These actions cumulatively suffice at the least to create a genuine fact issue of adverse action. In particular, transfer to a less desirable job, including a demotion, may qualify as an adverse action. *See Zelnik v. Fashion Institute of Technology*, 464 F.3d 217, 225–26 (2d Cir. 2006). The parties disagree whether plaintiff's transfer was a demotion. The City has provided evidence that Bourne's new position had a higher pay grade. Doc. #92-11 at 2. But plaintiff claims that she had lower income as a result of lost overtime opportunities, Doc. #96-13 at 206;

Doc. #92-1 at 8. She also points to an arbitration between herself and defendants that resulted in defendants paying plaintiff more than fifty thousand dollars for lost wages and overtime pursuant to the transfer. Doc. #145 at 4.

Plaintiff has clearly demonstrated a genuine issue of material fact as to whether she suffered an adverse action. A reasonable jury could conclude that she was transferred to a less desirable job, as well as subjected to additional material disadvantages at her employment prior to her transfer.[5]

Defendants also argue that even if plaintiff has demonstrated an adverse action, she has failed to demonstrate each defendant's involvement or responsibility for such adverse action. They rightly point out that plaintiff must show that each defendant "was personally involved— that is, . . . directly participated—in the alleged constitutional deprivation[]." *Gronowski v. Spencer*, 424 F.3d 285, 293 (2d Cir. 2005). I address this argument with respect to each defendant in turn.

Frechette was the Superintendent of Schools during the time of the events in this case; he was involved in the decision to suspend plaintiff after her altercation with Haynes, Doc. #97-41 at 12–19, and he participated in the negotiation between the Board and the City that resulted in plaintiff's transfer to a new position. Doc. #92-25 at 64; Doc. #97-6 at 5. He therefore directly participated in the alleged adverse action. And because he was an official with "final policymaking authority" for the Board, his actions were sufficient to generate liability for the

---

[5] To the extent that plaintiff relies in Count One on § 31-51q, that statute is restricted to retaliation that occurs in the form of "discipline or discharge," which may not extend to as broad a range of actions as the "adverse action" requirement that applies for a claim of First Amendment retaliation as pleaded in Count Two under 42 U.S.C. § 1983. *See Lynch v. Ackley*, 2014 WL 4782812, at *23–24 (D. Conn. 2014), *rev'd on other grounds*, 811 F.3d 569 (2d Cir. 2016). For the same reasons that I conclude there is a genuine issue of fact about whether there was an adverse action, I similarly conclude that there is a genuine issue of fact about whether plaintiff was subject to discipline by means of the actions allegedly taken against her.

Board with respect to plaintiff's free speech claims as well. *See, e.g.*, *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008).

Defendant Haynes was plaintiff's supervisor when plaintiff worked at the Board, Doc. #96-13 at 116, and plaintiff has testified that Haynes was responsible for much of the alleged campaign of retaliation, including the denial of overtime, *id*. at 121, the battery, *id*. at 120, exclusion of plaintiff from office functions, *id*. at 135, and telling others in the workplace not to talk with plaintiff. *Id.* She therefore was also personally involved in adverse action against plaintiff.

The City, meanwhile, had the final authority over plaintiff's transfer—which, as discussed above, a reasonable jury could conclude was a demotion of serious enough magnitude to be an adverse action. Plaintiff has therefore adequately demonstrated that the City, along with each other defendant, "directly participated . . . in the alleged constitutional deprivation[]." *Gronowski*, 424 F.3d at 293.[6]

### 3. Causation

After establishing that she engaged in protected speech and was subject to adverse action, plaintiff must also show "that the protected speech was a substantial motivating factor in the adverse employment action." *Smith v. Cnty. of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015) (*per curiam*). "A plaintiff may establish causation either directly through a showing of retaliatory

---

[6] The Board argues that because the City had final authority over plaintiff's transfer, that transfer cannot be attributed to the Board as an adverse action taken by the Board against plaintiff. But the Board clearly agitated for plaintiff's transfer in its ongoing dispute with the City. *See, e.g.*, Doc. #95 at 15 (¶ 100) (stating that plaintiff's transfer was "a material condition of the settlement" between the Board and the City). Courts have found that defendants have committed adverse actions where they were "in a strong position to influence the final decision-maker," even absent the authority to make the final decision. *Purdie v. City Univ. of New York*, 2015 WL 129552, at *9 (S.D.N.Y 2015); *see also Wilson v. Deluca*, 2014 WL 991862, at *8 (N.D.N.Y. 2014). The Board's lack of transfer authority does not, therefore, save it from liability for its independent efforts to have plaintiff transferred.

animus, or indirectly through a showing that the protected activity was followed closely by the adverse action." *Ibid.*

Plaintiff presents a plausible narrative supported by testimony and other evidence that would permit a jury to find that her protected speech substantially motivated the adverse actions described above. First, in May 2010, plaintiff spoke with Giuliano at a church festival regarding the Board's accounting practices. Doc. #97-38 at 30. The next day, plaintiff gave a statement to the police regarding those concerns and the possibility that records were being destroyed. Doc. #97-32 at 2. The City began investigating the Board that same day. Doc. #97-34 at 2; Doc. #97-45 at 8. The next day, Haynes began monitoring plaintiff's email. Doc. #97-45 at 8. The day after that, Haynes began denying plaintiff overtime opportunities. Doc. #96-13 at 120–21.

By the next month, Haynes was "no longer speaking to [plaintiff] pretty much at all," and there was "a constant negativity back and forth with the city and the Board." Doc. #96-13 at 136. In September, Haynes gave plaintiff a memo listing concerns with plaintiff's job performance. *Id.* at 149–51. In November, plaintiff was temporarily suspended from work. *Id.* at 176. When she attempted to return from that suspension, she and Haynes had a physical encounter that plaintiff alleges constituted a battery. *Id.* at 199. By December, negotiations were underway for plaintiff's transfer from the Board to another agency within the City. Doc. #96-6 at 14. A reasonable jury could infer from all this that plaintiff's speech was a substantial motivating factor in the climate of hostility that appears to have existed between the Board and plaintiff in the months between May and December of 2010.

Defendants dispute causation on two main grounds. First, defendants Frechette, Haynes, and the Board assert that plaintiff has not shown that they knew of plaintiff's protected speech, and so any adverse action they took against plaintiff cannot have been motivated by that speech.

Doc. #94 at 37. But Haynes testified that on May 21, 2010, she learned that plaintiff was one of several people who had given Giuliano information that had prompted him to send the police to the Board's offices. Doc. #97-45 at 5. And when Haynes requested plaintiff's email from the Board's IT department on May 16, she specifically requested communication between plaintiff and Giuliano as a "priority," which a jury could understand to suggest that Haynes was already aware of plaintiff's communication with Giuliano. Doc. #97-17 at 2.

For his part, defendant Frechette testified that he read an article in the *Hartford Courant* on May 22, 2010, that identified plaintiff as one of three people who had "accused the district of misusing grant money, failing to return money to the city that was left over from the previous school year and illegally manipulating purchase orders." Doc. #97-59 at 2; Doc. #97-41 at 8. A reasonable jury could thus find that both Frechette and Haynes were aware of plaintiff's communication with Giuliano shortly after the City's investigation of the Board began.

Second, all of the defendants point to alternative explanations for the actions they took against plaintiff, and they assert that the actions would have happened even absent plaintiff's protected speech. They argue, for instance, that Haynes' denial of overtime "was a legitimate workplace instruction" that resulted from a reduced need for overtime. Doc. #101 at 18. Plaintiff's evidence does indicate that a new payroll coordinator was hired in April 2010, which could support defendants' claim that a reduction in overtime was a decision motivated by reduced need rather than retaliation. Doc. #97-10 at 4. But the evidence also suggests that in prior summer months, there were significant expenditures on overtime even when there were more employees in payroll. *Id.* at 3–4. Similarly, while defendants have provided evidence that the reduced schedule flexibility was a rule that applied to every employee, Doc. #96-34 at 2–3, plaintiff has testified that in practice others were given flexibility that she was denied. Doc. #96-

13 at 127–28. And while the City argues that it transferred plaintiff to keep her safe from

Haynes, Doc. #92-1 at 13, plaintiff notes that the culmination of her grievance process resulted in

a finding by an arbitrator that the City's "overriding impetus was to clear the path for a possible

settlement of the complex litigation with the Board." Doc. #132-2 at 13.[7]

At this stage in the proceedings, it is not up to the Court to "weigh the evidence and

determine the truth of the matter." *Tolan*, 134 S. Ct. at 1866. It is enough that, when the evidence

is viewed in the light most favorable to the plaintiff, she has submitted enough for a reasonable

jury to conclude that defendants' actions were substantially motivated by her protected speech.

*See Smith*, 776 F.3d at 118. While defendants have put forth plausible and perhaps persuasive

reasons why they would have taken the same actions regardless of plaintiff's speech, they have

not made such an overwhelming showing as to compel that conclusion. Defendants' motions for

summary judgment are therefore denied with respect to plaintiff's constitutional claims for free-

speech retaliation as alleged in Counts One and Two.

For similar reasons and in light of the competing and highly contestable facts, I will also

deny plaintiff's cross-motion for summary judgment with respect to her claims of free-speech

retaliation. While plaintiff has demonstrated that a reasonable jury *could* rule in her favor, she

has not put forth evidence that would *compel* me to conclude that any reasonable jury necessarily

would rule in her favor. Viewing defendants' evidence in the light most favorable to them, as I

must do when evaluating plaintiff's motion for summary judgment, it is possible that a jury could

conclude that defendants had non-speech-related reasons to reduce plaintiff's overtime hours,

---

[7] The Court is not bound by the findings of fact in the arbitration decision between plaintiff and the City,
but it may consider those findings for their persuasive weight. *See Collins v. New York City Transit Auth.*, 305 F.3d
113, 119 (2d Cir. 2002). Here, the Court does not view the arbitrator's findings as decisive on the issue of the City's
intent in plaintiff's transfer, but it does view them as sufficient to generate a genuine issue of material fact as to the
City's intent.

decrease her schedule's flexibility, and transfer her. Defendants had concerns about plaintiff's job performance, Doc. #96-13 at 149–51, and believed her to be involved in what the Board viewed as inappropriate breaches of their payroll system. Doc. #97-45 at 11–12. They have also provided evidence that there was animosity in the office toward plaintiff that antedated her protected speech. Doc. #96-1 at 8–9. I will therefore deny plaintiff's motion for summary judgment on this claim.

### *Qualified Immunity of Frechette and Haynes for Free-Speech Retaliation*

Defendants Frechette and Haynes argue that they are entitled to qualified immunity on plaintiff's claims of free-speech retaliation. Not every violation of the Constitution justifies an award of money damages in a civil lawsuit like this one. That is because the doctrine of qualified immunity protects individual government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court has explained that "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014).

In this manner, "qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Lane v. Franks*, 134 S. Ct. 2369, 2381 (2014). It follows that a public official is entitled to qualified immunity if "(1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were

lawful at the time of the challenged act." *Simpson v. City of New York*, 793 F.3d 259, 268 (2d Cir. 2015).

Here, I conclude that Frechette and Haynes are entitled to qualified immunity from plaintiff's claim of free-speech retaliation. Plaintiff held two public positions: a civil service position as payroll supervisor at the Board of Education and an elected position as the City's treasurer. Although it is true that plaintiff's speech concerned matters that were beyond her responsibilities as payroll supervisor (as I have already explained above), her speech about financial irregularities was at least arguably within the scope of her very broad responsibilities as treasurer in charge of the overall integrity of the City's public fisc. As I have noted above, the fact that plaintiff held the position of city treasurer did not license defendants to take retaliatory action against her as to her separate employment as payroll supervisor. Nevertheless, the factual situation here involving a plaintiff with dual public positions is somewhat unusual, and the parties have not cited case law that clearly establishes that the scope of a plaintiff's protected speech must be gauged solely by reference to just one of plaintiff's public positions rather than to both public positions.

Under the *Garcetti* rule, which was clearly established federal constitutional law at the time of the events in question, plaintiff's speech was not constitutionally protected if it was made pursuant to her official responsibilities rather than as a concerned citizen.[8] In light of ambiguity about the capacity in which plaintiff could be understood to have spoken, and in light of the absence of clearly established law addressing this factual context, an objectively reasonable

---

[8] Although the *Garcetti* rule was eventually rejected by the Connecticut Supreme Court in *Trusz*, this did not occur until some years after the events in question in this case. For purposes of plaintiff's free-speech claim under the Connecticut Constitution, it was not clearly established at the time that *Garcetti* would not apply. Of course, to the extent that neither Frechette nor Haynes were an "employer" subject to regulation under § 31-51q, it is unclear that either of them could be liable at all to plaintiff for any violation of her free speech rights under the Connecticut Constitution.

official in Frechette's or Haynes's position could have reasonably believed that plaintiff's speech was *not* constitutionally protected, because it was arguably made pursuant to her official responsibilities as city treasurer.[9] This conclusion would have been legally incorrect (as I have ruled above), but not clearly so. Therefore, it cannot be said that any reasonably objective official in Frechette's or Haynes' position would necessarily have known that taking the alleged adverse action against plaintiff would violate her constitutional rights to free speech. Accordingly, I conclude that defendants Frechette and Haynes have qualified immunity from plaintiff's free-speech retaliation claims as alleged in Counts One and Two of the complaint.

### Count Three – Battery

Defendant Haynes moves for summary judgment on plaintiff's battery claim against her. Haynes does not dispute that there was an incident involving Haynes and plaintiff in which there was physical contact between the two. Doc. #95 at 17 (¶ 123). Haynes' sole argument is that plaintiff has not presented sufficient evidence to show that Haynes intended any harmful or offensive contact that may have happened. Doc. #94 at 33–34.

Under Connecticut law, plaintiff may prove a battery without demonstrating that Haynes acted intending to cause plaintiff harm. A battery is generally defined under Connecticut law as "any touching of the person in rudeness or in anger." *Smith v. City of New Haven*, 166 F. Supp. 2d. 636, 644–45 (D. Conn. 2001). In Connecticut, "an actionable assault and battery may be one committed wilfully or voluntarily, and therefore intentionally; one done under circumstances showing a reckless disregard of consequences; or one committed negligently." *Alteiri v. Colasso*, 168 Conn. 329, 333 (1975); *see also Goodwine v. State of Conn. Dept. of Children & Families*,

---

[9] It is true that plaintiff herself disclaims speaking in her capacity as city treasurer. But the issue for purposes of qualified immunity is not what plaintiff thought or believed but what an objectively reasonable government official could have thought or believed with respect to the constitutional lawfulness of his or her actions.

2010 WL 2232663, at *4 (D. Conn. 2010). Haynes's argument that plaintiff cannot demonstrate her intentional action is therefore insufficient to dismiss plaintiff's battery claim.

Even if intent were a requirement, moreover, plaintiff has provided sufficient evidence for a reasonable jury to conclude that Haynes committed intentional battery. Plaintiff has submitted a police report including a sworn statement from a witness to the incident, Leslie Spatola. Doc. #97-37. Spatola states that when plaintiff attempted to leave her office, Haynes "stood in front of [plaintiff] in a position [she] could not pass easily," demanded plaintiff's key to the office, and "put her arms and hands up and grabbed [plaintiff's] arm." *Id.* at 3. These statements are consistent with plaintiff's own testimony. Doc. #96-13 at 199–202. Examining these facts in the light most favorable to the plaintiff, a reasonable jury could conclude that Haynes had acted "intending to cause a harmful or offensive contact" with plaintiff and had in fact caused such contact. *Alteiri*, 168 Conn. at 334 n.3. I therefore deny Haynes's motion for summary judgment on plaintiff's battery claim.

### Count Four – Connecticut's Whistleblower Protection Statute

The City and the Board also seek summary judgment on plaintiff's claim under Connecticut's whistleblower protection statute, Conn. Gen. Stat. § 31-51m, which provides that "no municipal employer shall discharge, discipline or otherwise penalize any employee because the employee, or a person acting on behalf of the employee, reports, verbally or in writing, to a public body concerning the unethical practices, mismanagement or abuse of authority by such employer." *Ibid.*[10]

---

[10] The complaint alleges that both the City and the Board were "employers" within the meaning of § 31-51m, *see* Doc. #70 (¶¶ 3, 7), and neither the City nor the Board appear to dispute their status for purposes of summary judgment. Because § 31-51m provides for liability only against an "employer," it does not appear that plaintiff intended to name defendants Frechette and Haynes in Count Four. *See Nyenhuis v. Metro. Dist. Comm'n*, 604 F. Supp. 2d 377, 384 (D. Conn. 2009) (discussing a plaintiff's concession that individual defendants were not an "employer" within meaning of § 31-51m).

The City argues that plaintiff's claim must be denied because she brought it before exhausting her administrative remedies, as required by Conn. Gen. Stat. § 31-51m(C). Doc. #92-1 at 17. In particular, the City argues that plaintiff "had available to her the grievance process set forth in the collective bargaining agreement between the City and the Union," but did not pursue that process through to its conclusion before bringing her claim in this Court. *Ibid.*

The City is right that § 31-51m has an exhaustion requirement. But Connecticut courts have held that "pursuant to General Statutes § 31-51bb, an employee is not required to exhaust the grievance procedures of a collective bargaining agreement prior to bringing a claim under General Statutes §31-51m." *Arnone v. Town of Enfield*, 1997 WL 80635, at *2 (Conn. Super. 1997); *see also Perry v. EASTCONN Regional Educ. Serv. Ctr*, 2013 WL 1849523, at *3 (Conn. Super. 2013). Accordingly, defendant's exhaustion argument fails, and plaintiff's claim may proceed.

Section 31-51m operates similarly to the First Amendment's protections for public employees. A violation requires proof that (1) a plaintiff engaged in speech protected by the statute; (2) the plaintiff was subsequently disciplined or discharged from her employment; and (3) a causal connection exists between the plaintiff's protected speech and her discipline or discharge. *See Fasoli v. City of Stamford*, 64 F. Supp. 3d 285, 295–96 (D. Conn. 2014).

Here, plaintiff engaged in speech protected by the statute, as the statute protects verbal reports of mismanagement made to a public body. *See* Conn. Gen. Stat. § 31-51m. Plaintiff verbally reported to the mayor her concerns regarding the mismanagement of money by the Board.[11] Doc. #97-38 at 30; Conn. Gen. Stat. § 31-51m. As discussed above, plaintiff has also

---

[11] The statute defines "public body," by reference to Conn. Gen. Stat. § 1-200, to include "any executive, administrative, or legislative office of the state or any political subdivision of the state and any state town or agency," and "any employee, member, or officer thereof." Conn. Gen. Stat. § 31-51m(a)(4); Conn. Gen. Stat. § 1-

raised a genuine issue of material fact as to whether she was disciplined in connection with that speech, satisfying her burden on the remaining two elements of her § 31-51m claim. *See Fasoli*, 64 F. Supp. 3d at 295–96. I therefore decline to grant defendants' motion for summary judgment with respect to plaintiff's claim under § 31-51m. And, as above, because defendants have also raised a genuine issue of fact as to whether plaintiff was disciplined and whether any discipline was causally connected to her speech, I decline to grant plaintiff's cross-motion for summary judgment on the claim as well.

### *Procedural Due Process*

Plaintiff further claims that the City, the Board, and Frechette denied her right to procedural due process when they suspended her and transferred her out of her payroll position without giving her notice and an opportunity to be heard. Docs. #70 at 13–15; #97-1 at 37.

The Fourteenth Amendment to the United States Constitution provides that a State shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const., Amdt. 14, § 1. The "standard analysis" for a claim of a violation of procedural due process "proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (*per curiam*); *see also Fusco v. State of Conn.*, 815 F.2d 201, 205 (2d Cir. 1987) (court must determine whether there was a property right, whether there was a deprivation of this right, and whether there was adequate process to justify deprivation of the right).

Plaintiff cannot demonstrate that she was deprived of a property right with respect to her pre-transfer suspensions. As plaintiff acknowledges, she was suspended with pay. Doc. #70 at

---

200(1)(A). Mayor Giuliano, a municipal officer, therefore qualifies as a public body under the statute, as well as the Middletown police department.

14. "'An employee who is on leave and receiving [her] normal salary' is not 'deprived of a property right merely b[y] virtue of being relieved of [her] job duties." *MacFall v. City of Rochester*, 495 Fed. App'x 158, 160 (2d Cir. 2012). Plaintiff cites case law holding that a paid suspension may be an adverse employment action for purposes of a Title VII discrimination claim, *see, e.g.*, *Baker v. Connecticut*, 2006 WL 581205, at *8 (D. Conn. 2006), but an adverse employment action is not equivalent to deprivation of a constitutionally protected property interest. Accordingly, I conclude that there is no genuine issue of fact to support plaintiff's claim that she was suspended in violation of her right to procedural due process.

On the other hand, I conclude that genuine fact issues remain with respect to her claim that her transfer amounted to a demotion and that this transfer was effectuated in violation of her right to procedural due process. Plaintiff was transferred to a job with a higher pay grade, but she asserts that she was deprived of overtime opportunities available at her prior job, with the result of a net decrease in compensation. The City, meanwhile, argues that the increase in pay compensated her for lost overtime opportunities. A reasonable jury could conclude that plaintiff was demoted, but the evidence does not compel such a conclusion.

In *Ciambriello v. County of Nassau*, 292 F.3d 307 (2d Cir. 2002), the Second Circuit held that a public employee whose collective bargaining agreement (CBA) provided that he would not be demoted without just cause had a property interest in not being demoted. *Id.* at 315–17. *Ciambriello* also held that the employee was entitled to a hearing before being deprived of this property interest. *Id.* at 321–23 (further rejecting claim that opportunity for post-deprivation grievance hearing as provided in CBA was constitutionally adequate).

The CBA at issue in this case does not contain identical provisions to the one at issue in *Ciambriello*, but similarly provides that "no employee shall be disciplined except for just cause."

Doc. #96-4 at 17.[12] While the CBA in this case does not specify that the term "discipline" includes a transfer to a less desirable position, *Ciambrello* "read the word 'discipline' more broadly to include any dismissal or demotion." 292 F.3d at 316. I therefore hold for the same reasons discussed in *Ciambrello* that plaintiff had a property interest in not being demoted (if in fact she was demoted).

As *Ciambrello* instructs, the process a public employee is due before being deprived of a protected property interest is a fact-specific inquiry, requiring the balancing of three factors: (1) the private interest affected by an official action, (2) the risk of an erroneous deprivation of such interest through the procedures used, and the value of additional or substitute procedural safeguards, and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *See* 292 F.3d at 319–20 (citing *Mathews v. Eldridge*, 424 U.S. 319, 325 (1976)).

In light of the parties' disputes about the facts, genuine fact issues remain about whether the process (or lack of process) that plaintiff received was all that she was constitutionally due. As to the first factor, the relevant private interest is plaintiff's interest in not being demoted—an interest less weighty than the interest in not being terminated, but still a substantial interest. *See id.* at 320. Because plaintiff ultimately received an award of about $53,000 for lost pay following arbitration (Doc. #145 at 4–5), this lost pay amount is a sound indication that plaintiff's interest was substantial.

The risk of an erroneous deprivation of plaintiff's interest is relatively difficult to determine and may depend to some degree on facts still to be resolved at trial. On the one hand, it may have been unlikely that plaintiff could have come forward with information that would

---

[12] Defendants and plaintiff disagree over which CBA applies to the facts in this case. This provision is present in both versions the parties have put forth. Doc. #96-4 at 17; Doc. #97-5 at 6.

have mitigated the Board's desire to see her go, or convinced the City not to acquiesce to the Board's demands as part of the parties' litigation settlement. But had plaintiff been given some notice and an opportunity to object to her transfer, it may have been possible for her to be transferred to a different position (or to the same position but with different terms) that would not have amounted to a demotion.

Nor is there a well-developed record to show the burden on the government from additional safeguards. The burdens of a pre-demotion hearing are generally regarded as minimal, as such hearings "need not be elaborate." *Ciambrello*, 292 F.3d at 320. All in all, although I conclude as a matter of law that plaintiff had a property interest in not being demoted, I conclude that genuine fact issues remain for trial about whether she was in fact demoted and about whether she should have received a pre-deprivation hearing.

If plaintiff does show that she was transferred without due process, only the City would be liable for violating plaintiff's procedural rights. Plaintiff argues that the Board was acting as the City's agent with respect to her transfer to the Budget Analyst position, but she acknowledges that the City, and not Frechette or the Board, had the final authority over that transfer. Doc. #103 at 30–31. Because municipal liability may only be predicated on the actions of an official with "final policymaking authority in the particular area involved," only the City may be liable for plaintiff's transfer. *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 123–27 (1988). I will therefore grant summary judgment for the Board and Frechette on plaintiff's due process claim; the claim will proceed against the City alone.

*Punitive Damages*

Defendants argue that they may not be liable for punitive damages under 42 U.S.C. § 1983. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). Plaintiff does not dispute this argument but notes that defendants may still be liable for punitive damages for free-speech retaliation under state law. *See* Conn. Gen. Stat. § 31-51q (providing in part that an "employer, including the state and any instrumentality or political subdivision, thereof" may be liable for damages "including punitive damages"); *see also Arnone v. Town of Enfield*, 79 Conn. App. 501, 521–22 (2003). Accordingly, insofar as defendants seem to argue that they are categorically immune from any award of punitive damages in this lawsuit, I will deny their motion for summary judgment as to those claims, without prejudice to the rights of defendants to argue at trial that the jury should not be instructed with respect to punitive damages.

CONCLUSION

As to Counts One and Two, the motions of the Board, the City, and plaintiff are DENIED and the motions of Frechette and Haynes are GRANTED. As to Count Three, defendant Haynes' motion for summary judgment is DENIED. As to Count Four, all parties' motions for summary judgment are DENIED. As to Count Five, I GRANT defendants' motions for summary judgment and DENY plaintiff's motion with respect to plaintiff's pre-transfer suspensions. With respect to plaintiff's post-suspension transfer, I DENY the motions for summary judgment by plaintiff and the City, and GRANT the motion by the Board and Frechette. This matter shall proceed to trial as to the remainder of plaintiff's claims against all defendants.

It is so ordered.

Dated at New Haven, Connecticut, this 27th day of March 2017.

 */s/ Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge